## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CEDRIC LEWIS,

                 Petitioner,

                 v.

UNITED STATES OF AMERICA,

                 Respondent.

Civil Action No. 23-22677 (BRM)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

Presently before the Court is Petitioner Cedric Lewis' ("Petitioner") motion to vacate, set aside, or correct his sentence ("Motion") pursuant to 28 U.S.C. § 2255. (ECF No. 1.) Following an order to answer, the Government filed a response to the Motion. (ECF No. 6.) For the reasons set forth below, Petitioner's § 2255 Motion is **DENIED**. Petitioner's certificate of appealability is also **DENIED**.

## I.    BACKGROUND

On October 20, 2020, Petitioner was charged by complaint with two counts of possession of a firearm and ammunition by a convicted felon, 18 U.S.C. § 922(g)(1) (counts one and three), and two counts of possession with intent to distribute controlled substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (counts two and four), and one count of possession of firearms in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i) (count five). (Crim. No. 21-068, ECF No. 1.) On July 28, 2022, Petitioner was charged by superseding information with above counts one through four. (*Id.*, ECF No. 39.) The superseding information did not charge Petitioner with count five, possession of a firearm in furtherance of a drug trafficking crime. (*See id.*) On the same day,

Petitioner waived his right to prosecution by indictment and consented to proceeding by the superseding information. (*Id.*, ECF No. 40.)

The Presentence Investigation Report ("PSR") summarized the events that led to the filing of charges against Petitioner as follows:

> During the week of September 6, 2020, law enforcement set up stationary surveillance around Frelinghuysen Avenue and Van Vechten Street in Newark, New Jersey, in response to numerous complaints of open-air drug transactions and an increase in violent crimes involving gang members.
>
> During that week, law enforcement recognized that one of the men in the area of Frelinghuysen Avenue and Van Vechten Street was Cedric Lewis [Petitioner], a/k/a "Smack," a/k/a "Smash." Officers observed Lewis approach several men who had engaged in hand-to-hand narcotics transactions and converse with them. Thereafter, Lewis and a few of the men walked away from a larger group, at which time Lewis removed an unknown item from his waistband area and handed each man an item in exchange for currency. Based on these observations, law enforcement believed that Lewis had just supplied several street-level narcotics dealers with controlled dangerous substances in exchange for currency.
>
> Based on these observations, law enforcement initiated an investigation of Lewis. Thereafter, law enforcement located Lewis's residence on Lackawanna Plaza in Bloomfield, New Jersey (the "Bloomfield Residence").
>
> Law enforcement reviewed surveillance footage from the Bloomfield Residence's parking garage and entrance from several dates in September 2020 and the video surveillance footage depicted Lewis as he entered the Bloomfield Residence numerous times in the late evening and depart from the Bloomfield Residence numerous times during the morning hours, which confirmed that Lewis resided at the Bloomfield Residence.
>
> Further, law enforcement surveilled the Bloomfield Residence area, with a focus on the Bloomfield Residence's garage. During the surveillance, law enforcement observed Lewis in the garage area as he swiped/allowed different cars to drive into the Bloomfield Residence's garage. Law enforcement obtained registration information for several of these vehicles through the Department of Motor Vehicles, which revealed that the searched cars were rental

vehicles. Utilization of rental cars is a common means to avoid detection, and is common among participants of narcotics schemes.

**The September 20, 2020 Incident**

On September 20, 2020, at approximately 11:28 p.m., law enforcement received information that a grey Jeep with tinted windows was in the area of Durant Street and Newark Avenue in Elizabeth, New Jersey, and that three men were inside of the grey Jeep carrying guns. Law enforcement received specific information that an individual known as "Smash" possessed a rifle.

Law enforcement responded to this call and located the grey Jeep. Three men exited the grey Jeep, after which a law enforcement officer approached them and searched them for weapons with negative results. Subsequently viewed body worn camera (BWC) footage from the September 20th incident revealed that one of the men who exited the Jeep was Lewis, who was wearing a green hooded sweatshirt, dark-colored pants, and a black baseball hat.

After the search, a law enforcement officer approached the grey Jeep, used a hand-held flashlight to illuminate the vehicle's interior, and observed what appeared to be a short-barreled rifle in plain view on the passenger's side floorboard. After this observation, the Jeep's occupants fled on foot.

Subsequently viewed surveillance footage from the Bloomfield Residence revealed that on September 20, 2020, at approximately 10:27 p.m., Lewis left the area wearing a green hooded sweatshirt, dark-colored pants, and a black baseball hat, and he carried a Louis Vuitton shoulder bag. In addition, this video revealed that, as Lewis walked, he appeared to be concealing a large item in the thigh area of his pants. Further, this video revealed that Lewis and several other individuals entered a green Jeep Cherokee, bearing temporary New Jersey registration V700245.

Surveillance footage from the area of Van Vechten Street and Hanford Street revealed that on September 20, 2020, at approximately 10:51 p.m., Lewis exited the green Jeep—still wearing a green hooded sweatshirt, dark-colored pants, and a black baseball hat, and still carrying a Louis Vuitton shoulder bag—and entered the front passenger seat of the grey Jeep. As Lewis walked between the vehicles, he continued to conceal a large item in the thigh area of his pants.

Subsequently, law enforcement lawfully searched the grey Jeep and recovered, among other items, the following items: an Anderson AM-15 assault rifle (Firearm-1); one 30-round magazine (the Ammunition); approximately 118 green jugs containing suspected crack cocaine, which were recovered inside a Louis Vuitton shoulder bag; approximately glassine envelopes of suspected heroin; $754.20 in United States currency; 30 rounds of .300 caliber ammunition; and three cellular phones.

A laboratory report completed by the New Jersey State Police confirmed the narcotics found in the grey Jeep were 0.07 grams of cocaine and 0.31 grams of heroin with a mixture of fentanyl. The report indicates eight samples of wax fold with powder and 117 sample of crystal/rock were submitted but not analyzed.

Additional video surveillance footage from the Bloomfield Residence revealed that on September 21, 2020, at approximately 1:03 a.m., Lewis returned to the Bloomfield Residence while wearing the same clothing. However, Lewis no longer carried the Louis Vuitton shoulder bag and Lewis no longer appeared to be concealing anything in the thigh area of his pants.

### The September 25, 2020 Search of the Bloomfield Residence

On September 25, 2020, law enforcement lawfully searched the Bloomfield Residence and recovered the following, among other items: one 9mm caliber semi-automatic pistol, Glock, model 19 GEN 4, bearing serial number SLX467, with an extended magazine (Firearm-2) and one .40 S&W caliber semi-automatic pistol, Glock, model 35 GEN 4, bearing serial number ZAY342, with an extended magazine (Firearm-3); drug paraphernalia and a scale; a green hooded sweatshirt, black sweatpants, and a black baseball hat; $800 in United States currency; one clear plastic bag containing a distribution quantity of suspected crack cocaine; several bundles of distribution quantities of suspected heroin; nine suspected Xanax pills; and several items and documents containing Lewis's personal information.

Firearm-1, Firearm-2, and Firearm-3 and the Ammunition were manufactured outside of the State of New Jersey, and thus traveled in interstate commerce prior to Lewis's possession of those items in New Jersey on September 20, 2020, and on September 25, 2020. The Firearms were tested and found to be operable—that is, they were each deemed capable of, and designed to, expel a projectile.

4

Firearm-1 contained a fore grip, a heat shield, a threaded barrel, a flash hinderer, a pistol grip, a picatinny rail, and a high-capacity magazine capable of holding 30 5.56 cartridges.

The magazines of Firearm-2 and Firearm-3 were found capable of holding in excess of 10 rounds and fall within definition of a "large capacity ammunition magazine." According to the investigation, Firearm-2 was stolen.

A laboratory report completed by the New Jersey State Police confirmed the narcotics found in the Bloomfield Residence were 14.12 grams of cocaine and 0.01 grams of heroin with a mixture of fentanyl. The report indicates 47 samples of wax fold with powder and three tablets were submitted but not analyzed.

On October 19, 2018, Lewis was convicted of the following crimes in the Superior Court of New Jersey, Essex County: Unlawful Possession of a Handgun, a second degree crime, in violation of N.J.S.A. 2C:39-5(b), a crime punishable by imprisonment for a term exceeding one year; Distribution of a Controlled Dangerous Substance on or near School Property, a third degree crime, in violation of N.J.S.A. 2C:35-7A, a crime punishable by imprisonment for a term exceeding one year. For these offenses, Lewis was sentenced to three years' imprisonment.

(PSR at ¶¶ 13–31.) Petitioner was arrested by law enforcement officials on December 6, 2020. (*Id.* at ¶ 32.)

On July 28, 2022, pursuant to a negotiated Plea Agreement, Petitioner pled guilty to the four-count superseding information. (Crim. No. 21-068, ECF No. 41.) Pursuant to the Plea Agreement, the parties agreed, should the Court accept the Plea Agreement, to a sentence between 72- and 84-months' imprisonment. (*Id.*, ECF No. 43.) Relevant here, Petitioner agreed to a waiver of his appeal and post-sentencing rights. (*See id.* at 5.) Petitioner agreed to "waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255." (*Id.*)

The PSR listed Petitioner's previous convictions. Relevant to his felon in possession of a firearm charge, Petitioner had sustained four convictions for crimes punishable by more than one

year of imprisonment. (PSR at ¶¶ 54, 57, 60.) In 2017, Petitioner was arrested for unlawful possession of a handgun and for distributing controlled dangerous substances on or near school property. (*Id.* ¶ 60.) In 2018, he was sentenced to 3 years' imprisonment on those charges. (*Id.*) Once he was released on parole on those charges in 2019, he was arrested for resisting arrest and drug-related offenses, which resulted in his parole being revoked. (*Id.* ¶¶ 60, 66.) Petitioner was released prior to the instances charged here. (*Id.* ¶ 60.) Petitioner was previously convicted of a felony theft offense in 2012 and was sentenced to 3 years' probation. (*Id.* ¶ 57.) Finally, in 2010, Petitioner was convicted of felony possession of controlled dangerous substances and was subsequently sentenced to one year of probation. (*Id.* ¶ 54.) Petitioner completed all custodial portions of his prior sentences before he possessed the instant guns.

On January 5, 2023, in accordance with the terms of the Plea Agreement, the Court sentenced Petitioner a total term of 72 months' imprisonment. (Crim. No. 21-068, ECF No. 49.) On November 27, 2023, Petitioner filed his § 2255 Motion arguing his § 922(g)(1) convictions are unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and the Third Circuit Court of Appeals decision in *Range v. Attorney General*, 69 F.4th 96, 98 (3d Cir. 2023) ("*Range I*"). (*See* ECF No. 1.)

## II.    LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied*, 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458–59 (D.N.J. 2003). A district court must hold an evidentiary hearing on a § 2255 motion unless the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief. 28 U.S.C. § 2255(b); *see also United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005).

## III.    DECISION

### A.    Petitioner waived his right to file a §2255 Motion

Petitioner knowingly and voluntarily waived his right to file a § 2255 Motion in his plea agreement. (*See* Crim. No. 21-068, ECF No. 43 at 5.) "A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Khattak*, 273 F.3d 557, 561 (3d Cir. 2001) (quoting *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995)). Waivers of the right to collaterally attack criminal proceedings "do not contravene public policy and courts should strictly construe such waivers." *Wiles v. United States*, No. 17-5077, 2020 WL 5055627, at *3 (D.N.J. Aug. 27, 2020) (internal quotation marks and citations omitted). Waivers of a criminal defendant's right to appeal or file a collateral attack are lawful so long as they are made "with knowledge of the nature [of those rights] and the consequences of the waiver." *United States v. Fazio*, 795 F.3d 421, 425 (3d Cir. 2015); *see also United States v. Khattak*, 273 F.3d 557, 560 (3d Cir. 2001). Those waivers are enforceable so long

7

as they were knowingly and voluntarily entered into, and the enforcement of the waiver would not work a miscarriage of justice. *Fazio*, 795 F.3d at 425.

Here, the record is abundantly clear that Petitioner was aware of the appellate and collateral attack waiver, understood its terms, and voluntarily agreed to it as part of his guilty plea.

The record indicates that Petitioner knowingly and voluntarily waived his right to seek § 2255 relief. Petitioner's signed written plea agreement providing the waiver is broad and applies to his collateral attack rights. Petitioner swore he understood and accepted he "waive[ed] certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255." (Crim. No. 21-068, ECF No. 43 at 5, 8.) Petitioner swore he discussed the plea agreement with his attorney, including the waiver portion, and he accepted its terms. (*Id.* at 8.) The terms of the agreement are sufficient and clear.

Additionally, Petitioner's July 28, 2022, plea colloquy establishes Petitioner knew and understood the terms of the plea agreement. Petitioner answered the Court as follows:

> THE COURT: Sir, do you feel with the explanation and advice provided by your lawyer you fully understand all the terms of the plea agreement?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And, sir, is it your understanding the plea agreement is supposed to set forth all the bargains and benefits flowing to you in exchange for your willingness to plead guilty to the charges set forth in the information?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Sir, do you have any questions about what the plea agreement means or what any of the words or phrases in that letter mean?

THE DEFENDANT: No.

THE COURT: And do you understand the terms of the plea agreement?

THE DEFENDANT: Yes.

(ECF No. 6-2, Plea Tr. at 18:1–16.) Petitioner stated that he was pleading guilty of his own free will. (*Id.* at 18:24–19:1.) Petitioner also stated that he understood that he was waiving his right to file "an appeal, petition, writ, motion, or any collateral attack challenging [his] sentence." (*Id.* at 29:1-6.) The record confirms Petitioner knowingly and voluntarily waived his right to pursue his present Motion.

Petitioner's knowing and voluntary waiver does not result in a miscarriage of justice. Although there "may be an unusual circumstance where an error amounting to a miscarriage of justice may invalidate the waiver," that is not the case here. *See United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001). The Third Circuit has endorsed the view that courts should evaluate appellate waivers on a case-by-case basis and consider the "clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." *Id.* at 563 (quoting *United States v. Teeter*, 257 F.3d 14, 25–26 (1st Cir. 2001)). None of those factors are implicated in Petitioner's case because, as explained below, he fails to identify any error in applying § 922(g)(1).

### B. Petitioner's claim is procedurally defaulted

Petitioner did not raise his claim on direct appeal. Petitioner cannot use a § 2255 motion as a substitute for an appeal. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and 'actual prejudice,' . . . or that he is 'actually innocent.'" *United*

*States v. Sanders*, 165 F.3d 248, 250 (3d Cir. 1999). Petitioner did not file an appeal challenging his § 922(g) convictions and his § 2255 motion does not claim "actual innocence." Petitioner cannot show actual prejudice because, for the reasons discussed below, a challenge to his § 922(g) convictions would have failed. As such, Petitioner's claims are both waived and procedurally barred.

### C.  Petitioner's claim lacks merit

Petitioner's claim also fails on the merits. The Second Amendment to the United States Constitution reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Section 922(g)(1) of Title 18 makes it unlawful for "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

In *United States v. Heller*, the Supreme Court found that the District of Columbia's ban on handgun possession in the home violates the Second Amendment. The Supreme Court ruled "that the Second Amendment conferred an individual right to keep and bear arms" unconnected to militia service. 554 U.S. 570, 595 (2008).  But that Supreme Court emphasized that "the right was not unlimited, just as the First Amendment's right of free speech was not" and, therefore, it did "not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for any purpose." *Id.* The Court in *Heller* stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* at 626. Additionally, the Supreme Court further qualified "that sorts of weapons protected were those in

common use at the time . . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.

In *McDonald v. City of Chicago*, the Supreme Court reiterated the limitations to the Second Amendment, noting "[w]e made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons. . . .'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. 570 at 626–27).

More recently, the Supreme Court in *Bruen* considered and struck down the New York regulatory licensing program, whereby an applicant was required to prove that he or she had "proper cause" to carry a handgun in public. 142 S. Ct. 2111. The Court in *Bruen* recognized that the Second Amendment protects the right of an "ordinary, law-abiding citizen . . . to carry a handgun for self-defense outside the home." *Id.* at 2122. The Supreme Court found that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). The right protected by the Second Amendment allows for a variety of gun regulations. *Bruen*, 142 S. Ct. at 2133. ("[T]he Second Amendment is neither a regulatory straitjacket nor a regulatory blank check."). The Court laid out the proper legal test for courts to apply when determining whether a law violates the Second Amendment, noting courts must assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. *Id.* at 2122, 2131. Under *Bruen*, courts must first determine whether the text of the Second Amendment applies to a person and his proposed course of conduct and, if it does, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127, 2134–35.

The government carries the burden to prove that there is a historical analogue for the modern regulation. *See id.* at 2127. The Government need not identify a "historical twin"; rather, a "well-established and representative historical analogue" suffices. *Id.* at 2133. Thus, when confronted with regulations "that were unimaginable at the founding," courts must reason "by analogy," which "requires a determination of whether the two regulations are relevantly similar" using "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33 (citing *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (internal quotation marks and emphasis omitted).

Shortly after *Bruen*, the Third Circuit issued an *en banc* decision in *Range* found in a "narrow" decision that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to Range. 69 F.4th at 98 ("*Range I*"). In *Range I*, Bryan Range plead guilty in 1995 to making a false statement to obtain food stamps. *Id.* at 98. At the time he plead guilty, his conviction was considered a misdemeanor punishable by up to five years' imprisonment. *Id.* The conviction precluded him from possessing a firearm under § 922(g)(1). *Id.* Range, however, desired to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him. *Id.* at 99. The Third Circuit Court of Appeals applied the *Bruen* analysis and found § 922(g)(1) unconstitutional as applied to Range.

First, the Third Circuit found Range was "one of 'the people' who have Second Amendment rights" because the term "the people" as used in the Constitution "'unambiguously refers to all members of the political community, not an unspecified subset.'" *Id.* (quoting *Heller*,

554 U.S. at 580). The Third Circuit next found that § 922(g)(1) regulated Second Amendment conduct, noting that "Range's request- to possess a rifle to hunt and a shotgun to defend himself at home-tracks the constitutional right as defined in *Heller*." *Id.*

The Third Circuit next asked whether the government had carried its burden to justify restricting Range's Second Amendment right. In order to justify § 922(g)(1) the restriction, as it applied to Range, the government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 142 S. Ct. at 2130). Ultimately, the Third Circuit determined that the government had not met its burden, because, in part, early law that prohibited convicted felons from possessing firearms applied only to violent criminals, and Range had not been convicted of a violent crime. *Id.* at 103–04. The Third Circuit emphasized that its ruling in *Range* "is a narrow one." *Id.* at 106. The Court acknowledged that *Heller* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 103. The court also referenced Justice Kavanaugh's concurrence in *Bruen*, which reiterated that felon in possession laws are "presumptively lawful." *Id.* at 103–04.

Most recently, in *United States v. Rahimi*, the Supreme Court endeavored to correct how "some courts have misunderstood" the *Bruen* standard. 144 S. Ct. 1889, 1897, 219 L.Ed.2d 351 (2024). Defendant Rahimi challenged a different provision of Section 922(g), one that prohibited him from possessing a firearm because he was subject to a domestic violence restraining order under Texas law. *See id.* at 1894–95; see also 18 U.S.C. § 922(g)(8). The United States Court of Appeals for the Fifth Circuit credited Rahimi's argument and concluded that the statute did not comport with historical firearm regulations. *See United States v. Rahimi*, 61 F.4th 443, 460-61 (5th Cir. 2023). The Supreme Court reversed, explaining that its prior precedents "were not meant to suggest a law trapped in amber," but rather "the appropriate analysis involves considering whether

the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1897–98. The Court recognized the nation's regulatory tradition recognized that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

Given this ruling, the Supreme Court vacated *Range* "for further consideration in light of *United States v. Rahimi*." *Garland v. Range*, 144 S. Ct. 2706, 219 L.Ed.2d 1313 (2024). Since the filing of the present Motion, the Third Circuit issued a new *en banc* decision in *Range II*, reaching the same conclusions as it did in its prior *en banc* decision. *See Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (*Range II*).

Here, to succeed on an as-applied challenge, Petitioner must show § 922(g)(1) as applied to him violates his Second Amendment rights to keep and bear arms. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."). Under *Bruen*, this Court must first determine whether the Second Amendment's text covers Petitioner and his proposed course of conduct. *Range*, 124 F.4th at 225 (explaining that "[a]fter *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct"). If so, then the Government must show § 922(g)(1) as applied to Petitioner "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (quoting *Bruen*, 597 U.S. at 19).

Applying the *Bruen* framework, the threshold question is whether Petitioner is one of "the people" protected by the Second Amendment despite having prior felony convictions. *Range II*, 124 F.4th at 228. In *Range II*, the Third Circuit ruled that "the people" refers to all Americans and not only law-abiding persons. *Id.* at 227–28. The Third Circuit rejected the government's argument

that "felons are not among 'the people' protected by the Second Amendment." *Id.* at 228. Therefore, Petitioner is one of "the people" protected by the Second Amendment.

However, the Government argues that the Second Amendment plain text does not apply to Petitioner's conduct because Petitioner has not shown that he possessed a firearm of a lawful purpose. (ECF No. 6 at 20–22.) In *McDonald*, the Supreme Court recognized that *Heller's* central holding is "that the Second Amendment protects a personal right to keep and bear arms for *lawful purposes*." 561 U.S. at 780 (emphasis added). And in *Range II*, the Third Circuit found the Second Amendment plain text covered Range's "conduct" because Range sought "to possess a rifle to hunt and a shotgun to defend his home"—conduct that "tracks the constitutional right as defined by *Heller*." 124 F.4th at 228.

Here, Petitioner does not argue that he carried the three firearms on two separate occasions for a lawful purpose. Rather, Petitioner pled guilty to possessing three firearms, while at the same time possessing with the intent to distribute heroin and cocaine. Courts in this circuit have held that the Second Amendment does not protect the possession of a gun in furtherance of criminal activity, such as drug trafficking. *See United States v. Jenkins*, No. 23-088, 2023 WL 6534200, at *16 (E.D. Pa. Oct. 6, 2023) ("The question is, '[i]ndependent of [§] 922(g)(1), is the conduct itself "Second Amendment conduct"?' The answer to that question must be more specific than 'carrying a gun,' because . . . it is beyond dispute that at least some purposes for carrying a gun are not Second Amendment conduct."); *United States v. Eddings*, Civ. A. No. 21-117, 2023 WL 7194772, at *3 (W.D. Pa. Nov. 1, 2023) (holding the Second Amendment did not cover defendant's conduct as "[d]efendant's conduct of possessing a firearm and ammunition in a vehicle with drug paraphernalia, and while [d]efendant himself possessed drug paraphernalia, establishes [d]efendant as a person who is dangerous to the safety of the public and is disruptive to the orderly

functioning of society."). Therefore, it appears Petitioner's conduct may not be protected by the Second Amendment. However, the Court need not decide that issue, because even if Petitioner's conduct is covered by the plain text of the Second Amendment, the Government has affirmatively shown that § 922(g)(1) as applied to Petitioner was "consistent with the Nation's historical tradition of firearm regulation."

As explained in *Bruen*, and re-affirmed in *Rahimi*, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphasis in original). "'To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue." *Range II*, 124 F.4th at 228 (citing *Rahimi*, 144 S. Ct. at 1898). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30. In determining whether historical and modern firearms regulations are similar enough, the Court inquiries into "how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Bruen*, 597 U.S. at 29.

The Government notes that the Second Amendment "codified a right 'inherited from our English ancestors.'" (ECF No. 6 at 31 (quoting *Heller*, 554 U.S. at 599)). In England, for example, "a 17th century statute empowered the government to 'seize all arms in the custody or possession of any person' who was 'judge[d] dangerous to the Peace of the Kingdom.'" (*Id.* (quoting Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13).) This statute "continued unabated" after the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms. (*Id.* (citing Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019)).)

The Government points to colonial and early state legislatures who disarmed individuals who "posed a potential danger" to others. (ECF No. 6 at 32 (citing *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012)).) At Pennsylvania's ratifying convention, Anti-Federalists proposed a bill of rights that, among other things, would have prohibited "disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." (*Id.* (citing *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976)).)

The government notes that in the mid-19th century, Edward Livingston, one of the Nation's early leading lawyers, proposed model legal codes, "which did not provide for capital punishment, listed the 'suspension' and permanent 'forfeiture' of 'political and civil rights'—including the 'right of bearing arms in defense of the country'—as among the punishments courts could impose." (*Id.* at 33, (citing Edward Livingston, *A System of Penal Law for the State of Louisiana* 26-27, 29 (1824).)

Federal law first prohibited persons convicted of a felony from "receiving" firearms in 1938. Federal Firearms Act of 1938, Pub. L. No. 75-850 § 2(f), 52 Stat. 1250, 1251 (1938). This law only applied to persons "convicted of a crime of violence," which included "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." *Id.* §§ 1(6), 2(f). In 1961, Congress eliminated the "crime of violence" limitation. An Act to Strengthen the Federal Firearms Act, Pub. L. 87–342, 75 Stat. 757 (1961). In 1968, Congress changed the prohibited act to "possession," creating the law in its current form. Pub. L. No. 90-618 § 922(g)(1), 82 Stat. 1213, 1220 (1968).

17

The Eighth Circuit Court of Appeals, summarized Congress's intent in enacting § 922(g)(1) as follows:

> Congress enacted an analogous prohibition in § 922(g)(1) to address modern conditions. In the Omnibus Crime Control and Safe Streets Act of 1968, Congress found that there was "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce," and that "the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals . . ., narcotics addicts, mental defectives, . . . and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States." Pub. L. No. 90-351, § 901(a)(1), (2), 82 Stat. 225, 225. Congress found that "only through adequate Federal control over interstate and foreign commerce in these weapons" could "this grave problem be properly dealt with." *Id.* § 901(a)(3). By prohibiting possession of firearms by convicted felons and others, Congress intended to further this purpose without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens." *Id.* § 901(b). In the Safe Streets Act of 1968 and the Gun Control Act of 1968, Congress also tailored the prohibition on possession of firearms by exempting those convicted of felony offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate." *Id.* § 902 (codified at 18 U.S.C. § 921(b)(3)); Pub. L. No. 90-618, 82 Stat. 1213, 1216 (codified at 18 U.S.C. § 921(a)(20)).

*United States v. Jackson*, 69 F.4th 495, 504–06 (8th Cir. 2023)

The Supreme Court has observed that the purpose of the Safe Streets Act, as amended by the Gun Control Act, was to curb "lawlessness and violent crime." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The "very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Congress prohibited "categories of presumptively dangerous persons from transporting or receiving firearms," *Lewis v. United States*, 445 U.S. 55, 64 (1980), because they "pose[d] an unacceptable

risk of dangerousness." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 120 (1983). "Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Id.* at 119.

Courts in this circuit have agreed that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation as applied to individuals, like Defendant, who have sustained prior felony convictions for drug trafficking and firearms offenses. *See Porter v. United States*, No. 22-6199, 2023 WL 6366273, at *7 (D.N.J. Sept. 28, 2023) ("Petitioner's prior convictions for drug possession and distribution, including a felony drug conviction in which he was sentenced to three years imprisonment and had been release[d] from custody shortly before his arrest for the instant conviction, show[s] that he poses a danger to society."); *United States v. Blackshear*, No. 23-159, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) (denying an as-applied challenge to § 922(g)(1) based on *Heller* and the history of disarming dangerous individuals where a defendant had multiple felony drug and firearm convictions); *United States v. Minter*, No. 22-155, 2023 WL 6051265, at *6, *9 (M.D. Pa. Sept. 15, 2023) (denying motion for reconsideration on as-applied challenge to Section 922(g)(1) by defendant with felony drug convictions based on *Heller* and historical statutes disarming individuals "deemed dangerous, untrustworthy, or unlikely to abide by the law" as proper historical analogues to Section 922(g)(1).)

Petitioner's prior convictions involve acts of drug trafficking, and firearms. Those convictions indicate that he presents a potential danger to society and falls into the historical group of people who "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S.Ct. at 2152. The government has carried its burden of proving that §922(g)(1) is constitutional as applied to him.

IV. **CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

V. **CONCLUSION**

For the reasons set forth above, Petitioner's motion to vacate sentence (ECF No. 1) is **DENIED** and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

/s/Brian R. Martinotti
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated: March 14, 2025

20